UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| ANASTASIA NEDD ALLEN | * | CASE NUMBER: 20-CV-304 |
| VERSUS | * | JUDGE: ASHE |
| LOUIS DEJOY, UNITED STATES POSTMASTER GENERAL | * | MAGISTRATE: NORTH |

*************************************************************************

STATE OF LOUISIANA
PARISH OF JEFFERSON

## AFFIDAVIT OF ANASTASIA NEDD ALLEN

BEFORE ME, the undersigned Notary Public, duly qualified in and for the afore stated Parish and State, personally came and appeared:

**ANASTASIA NEDD ALLEN**

a person of the full age of majority, and a resident of and domiciled in the Parish of Orleans, State of Louisiana, who after being duly sworn by me, did depose and state that:

### A. GENERAL STATEMENTS

**1. No Training.** During my second probationary period with the USPS, none of my managers trained, re-trained, coached or counseled me regarding any aspect of my job, including, but not limited to: how to move on the clock to avoid clock ring errors; handling registered mail; using the scanner; how to efficiently deliver mail on a route; and how to move efficiently on the route to avoid extended time.

**2. No Tools.** During my second probationary period with the USPS, none of my managers provided me with the proper tools to enable me to do my job effectively, including scanners, arrow keys, scan points, pin numbers for Voyager cards, and maps. Because of their actions, they made it unreasonably difficult for me to perform my duties effectively and meet the requirements of my job, and so they were able to terminate me for the reasons stated in my February 26, 2019 Letter of Separation.

**3. No Communications.** During my second probationary period with the USPS, none of my managers communicated with me clearly, fairly or constructively, but resorted to verbal attacks of a personal and harassing nature because of my age and in retaliation for my prior EEO activity. Their actions had the effect of making it unreasonably difficult for me to perform my duties effectively and meet the requirements of my job, and so they were able to terminate me for the

1

reasons stated in my February 26, 2019 Letter of Separation.

**4. No Constructive Criticism.** During my second probationary period with the USPS, none of my managers gave me meaningful information about any alleged deficiencies. They did not identify my alleged deficiencies with any specificity but presented them in vague and generalized terms. Furthermore, my managers neither provided me with constructive criticism, nor did they tell me that I needed improvement. They did not offer additional training, coaching or counseling to help me improve and learn my craft. Because of these failures, my managers made it unreasonably difficult for me to perform my duties effectively and meet the requirements of my job, and so they were able to terminate me for the reasons stated in my February 26, 2019 Letter of Separation.

**5. No Chance to Improve.** As a result of their failure to train me, communicate effectively, give me the tools to do my job and evaluate me timely, fairly and according to policy, none of my managers gave me an opportunity to address any deficiencies, learn my craft and improve my job performance, if there were in fact issues with it. As a result, postal managers and supervisors used my purported job deficiencies to terminate my second CCA job and to deny me other employment opportunities with the USPS.

## B. STATEMENTS RESPONSIVE TO PORCHE DECLARATION (R. Doc. 59-4)

1. Supervisor Joe Porche ("Porche") claims that I was "separated "on July 18, 2018, however I was told that I was being terminated from my first employment. However, my PS Form 50 Notification of Personnel Action dated November 2018 states I was terminated not separated. When my supervisor(s) ended my employment a second time on February 26, 2019, Porche gave me a Letter of Separation stating that I was being "separated" from the United States Postal Service ("USPS"). However, my final PS Form 50 dated March 22, 2019 states "Termination" under "NATURE OF PERSONNEL ACTION." (Exhibit A, March 22, 2019 PS Form 50)

2. As I understand USPS policy and procedures, the USPS can end a City Carrier Assistant's ("CCA") employment by separation or termination depending on the reason for ending the employment. It is my understanding that the USPS can separate a CCA because their service is no longer needed or because of personal circumstances of the CCA. It is my understanding that the USPS can terminate a CCA's employment based on work ethic violations or standards, committing a crime, damage to postal property, or theft of mail.

3. It is my understanding of USPS policy and procedures, that a CCA who is separated from their employment can be rehired by the USPS but a CCA whose employment is terminated cannot be rehired by the USPS.

4. My Supervisor Charlotte Lagrue ("Lagrue") instructed me to clock in daily to the street time code upon my arrival at work. I was forced to perform office duties while on street time which gave the appearance of expanded street times. Delayed mail was due to Supervisor Lagrue hiding mail from me and not giving me an arrow key to open mail receptacles on my routes. Lagrue also refused to let me sort (case) and prepare my mail for delivery (pull down) before leaving the station. Another carrier cased and pulled down my mail, so it was often mis-sorted. Dealing with missorted mail added to my street time and resulted in delayed mail. To my knowledge, Porche

2

never observed me performing my duties and was not present in the station when I was working, therefore he could not have the personal knowledge expressed in his declaration, R. Doc. 59-4, p. 1, ¶ 8.

5. I never received feedback from Joe Porche, my supervisor Charlotte Lagrue or Bianca Martin when it came to my performance. To my knowledge, Joe Porche did not observe me performing my duties and was not present at my evaluations, therefore he could not have the personal knowledge expressed in his declaration, R. Doc. 59-4, p. 1, ¶ 9.

6. I was never advised of my deficiencies by Joe Porche, my Supervisor Charlotte Lagrue or Bianca Martin nor was ever told that I had any. They did not provide me with constructive criticism. Porche did not advise me, nor does he have firsthand information.

7. I have never ever been combative with any supervisor or management official with the USPS. I have never been in a situation that would call for combativeness. Porche was not present during my probationary evaluations. He has no firsthand information concerning my conduct during the evaluations. Bianca Martin ("Martin") was the other supervisor who was present with Supervisor Lagrue during my evaluations. Martin was not called in because I was allegedly combative; she was already in the room when I arrived. In her declaration, Martin admits she was there helping with the evaluation (R. Doc. 59-17, p. 1, ¶ 4).

8. As indicated on my PS Form 50 of March 22, 2019, I was terminated from the USPS, not separated as Porche states. Porche and Lagrue set me up to fail so Porche could terminate me for poor performance. They did not train me properly, did not advise me of any deficiencies in my job performance, did not evaluate me properly or provide feedback, and did not allow me time to learn my craft. They had me follow their instructions, whether those instructions were right or wrong, or resulted in deficiencies like expanded street time. They altered my clock rings to reflect street time rather than actual office time, and they moved me on the clock to other crafts (i.e., customer service, collections, clerk functions) which I have never worked. They would hide mail and parcels from me before I left on my route and then would call me back claiming that I left mail/parcels. I did not leave my scanner in the building; it was taken by someone when I went to the restroom and I could not leave the building to deliver mail until I received another scanner.

9. I did possess and display the qualifications for my position. On January 18, 2019, I attended a meeting at my request with Porche and Jackson. In the meeting, I asked Porche to come and observe me as I delivered the mail and performed other carrier duties, to prove I did not have performance issues to him since he had not observed me personally. Porche agreed and said he would walk with me by the end of the week. To my knowledge, Porche never walked with me to observe my performance. Therefore, he could not have the personal knowledge expressed in his declaration that I did not display and did not possess the qualifications for the position, R. Doc. 59-4, p. 2, ¶ 14. Porche and Lagrue set me up to fail.

10. I was terminated because of my age during my first employment period; this was proven. It happened again during my second employment period. Porche's age-related bias was evident and ongoing throughout my reinstatement and second probationary period. When I was reinstated on November 20, 2018, I asked Porche to not put me on another probationary period. Porche replied

that he does not like to hire older workers because they tend to get hurt and go on restriction until they retire. He said he did not need another carrier with restrictions on his clock. He said this in my shop steward Charles Jacksons presence. Furthermore, when he would give me instructions, he would always end the conversation by stating "this is not a set up" with a smirk on his face.

11. I had rights to the union grievance process because I was left in the USPS's employment rolls past my 90/120 days of probation and past the termination date of my employment. I remained in the system and continued to have access to the postal system. After I left the USPS, I applied for unemployment benefits but was denied because the Louisiana Workforce Commission found that I was still employed with the USPS. It is my understanding that USPS and NALC policies state that as long as I am on the USPS rolls, that time counts towards my employment period.

12. He provided more information to Postmaster Alisa Leonard ("Leonard") than he is saying. Porche made false and inaccurate statements to Leonard that I was released from my probationary period for these baseless reasons: unacceptable work performance and my attitude toward work and my supervisor. He also told her falsely that I was a difficult employee who challenged what I was told as it related to instructions and work deficiencies. He told her falsely that I would go straight to the union to verify if I had to follow an instruction. Regarding signing my evaluations, I was within my right to refuse to sign them when my supervisors were not providing them timely and not providing me with feedback on my job performance or how it was deficient. Porche was not my immediate supervisor, therefore he does not have firsthand or personal knowledge of the information he gave Leonard. (R. Doc. 59-10, p. 1, ¶ 8)

## C. STATEMENTS RESPONSIVE TO McFALL DECLARATION (R. Doc. 59-8)

1. I applied for these two job positions at the Metairie Post Office: Job Posting Nos. 10242872 and 10292967. I did not apply for the job listings Postmaster Matthew McFall ("McFall") referenced in his declaration, NB10309503 and NB10258082. (*See* R. Doc. 59-8, p. 1, ¶ 4) McFall was aware of my EEO because I had voluntarily told Manager Chad Taylor about my EEO, and because McFall told me that he rescinded the job offer for the second Metairie job opening (No. 10292967) due to my EEO activity in a conversation we had in May 2019.

2. In February 2019 when I interviewed with Manager Chad Taylor ("Taylor") for the first Metairie job position (Job No. 10242872), Taylor told me that McFall had communicated with Porche who had said unfavorable things about me.

3. When I interviewed for the first Metairie job opening (No. 10242872), I informed Manager Taylor that I had filed an EEO complaint and that I had been terminated from the USPS during my first 90-day probationary period in July 2018. In the interview, Taylor asked why I wanted to work at the Metairie Station. I explained that I was being discriminated against, had filed an EEO, and wanted to work in an environment that was free of discriminatory actions toward employees. Taylor responded by saying that I was doing the right thing and said not to give up my EEO. It is my understanding of USPS hiring procedures, that Taylor as the designee for interviews would have given my interview notes to McFall.

4. In February 2019 when I applied for a second job opening at the Metairie Post Office (No. 10292967). I was interviewed for this second position and was given a job offer via email which

4

I accepted. Postmaster McFall never interviewed me or ever asked me about my USPS employment. Manager Taylor never asked about my USPS employment either. However, I did voluntarily give my employment status to Taylor on a phone a call to him shortly after I was separated, and I also put information about my employment status on my USPS application. I never had an interview with McFall nor did I speak with him during the interview process. Therefore, I never told him that I was working for the USPS in New Orleans.

5. I did meet all requirements for the position because I did not lie during my interview or on my application. I accurately disclosed my employment status with the USPS on my application and during my interview with Manager Taylor.

**D. STATEMENTS RESPONSIVE TO LEONARD DECLARATION (R. Doc. 59-10)**

1. I met Postmaster Alisa Leonard as an applicant for the Marrero Post Office CCA position (Job No. 10292968). Brene Muhammad and I were both applicants for the same job listing in Marrero. We both met Leonard on the same day and time for the beginning of the interview sessions. I know Muhammad was under age 40 because we exchanged phone numbers and we had subsequent conversations in which she told me her age. In her declaration, Leonard states she was not aware of my EEO activity (R. Doc. 59-10, p. 1, ¶ 4), but then states that Muhammad did not have a prior EEO (R. Doc. 59-10, p. 1, ¶ 7).

2. Manager Porche and Supervisor Lagrue gave false and misleading statements about my work history, performance, work ethics and character which resulted in my not being considered for a position at the Marrero Post Office. Whenever I was given instructions by supervisors, I did what I was told. If they instructed me to do something that was contrary to my training or understanding of USPS policies and procedures, I would ask my shop steward if the instructions given were correct and did not violate postal policy. In each case where I sought guidance from my shop steward, the instructions I had received were a present violation of postal policy or procedure. Finally, I was not required to sign my performance evaluations.

3. Postmaster Leonard's decision not to hire me was based on false and misleading information concerning my job performance, alleged deficiencies, personal conduct, and my qualifications and fitness as a CCA which was given to her by my former manager Joe Porche and supervisor Charlotte Lagrue. They did this in retaliation for my filing an EEO complaint (USPS EEO No. 4G-700-0049-19) against them.

**E. STATEMENTS RESPONSIVE TO SEGURA DECLARATION (R. Doc. 59-11)**

1. Ms. Tracy Segura ("Segura") was aware of my EEO activity because when I went to see her in person on May 22, 2019 after learning that my job offer for the second Metairie Post Office CCA position (Job No. 10292967) had been rescinded, she informed me that she had rescinded the offer because I was "at war" with USPS because of my prior EEO charges against the USPS and Station Manager Porche. At that time, McFall, who as the Metairie Postmaster had the final authority to hire, was not aware that my job offer had been rescinded by Segura because he was on leave. When McFall returned, Segura told him about my EEO before I had an opportunity to talk to him. When he called me, he stated he was going to allow the offer to be rescinded because of my EEO

activity. I never lied in my interview about my employment status.

2. The USPS, through the actions of Porche, Lagrue, Segura, and/or McFall, rescinded the job offer extended to me for the Metairie Post Office CCA position (Job No. 10292967) because of my age, in retaliation for my prior EEO activity, or both.

3. On May 22, 2019 when I received the email of "suitability and eligibly" rescinding the offer for Job No. 10292967, I went to the human resources office at the main USPS station in downtown New Orleans where I met with Tracy Segura. I explained to her that I was given a job offer in Metairie and I accepted it. I explained that I had completed all the background, drug and driving screenings successfully. I showed her a copy of the email sent stating that I was not suitable for the position and the offer was being rescinded with no signature. She then informed me that she had sent the email and she was the one who rescinded the job offer because I was at war with the post office due to my current EEO activity. I never told her that I had discussed "another EEO" with her supervisor, Treva Sanders, or Alan Powell.

4. While Segura never explained the hiring process to me on May 22, 2019, in her affidavit she stated that if my name come up in USPS records as "terminated," she would rescind the offer, R. Doc. 59-11, p. 2, ¶ 12. But my February 26, 2019 Letter of Separation states that I was "separated." Based on my training and understanding of USPS policies obtained during my employment with the USPS, I would have been eligible for re-hire with the USPS as an employee who had been "separated." Furthermore, the USPS, through Manager Joe Porche and Supervisor Tressie Henry, discriminated against me and terminated my previous employment based on my age. Their discriminatory actions taken during my employment and in terminating my employment served as the basis for my initial EEO complaint, USPS EEO No. 4G-700-00163-18, which was settled through the informal and confidential settlement process with the ADR Specialist, myself, my EEO representative and my supervisor Joe Porche. The USPS used this prior and wrongful job "termination" as a basis for denying me for other job positions within the USPS.

5. When I met with Ms. Segura on May 22, 2019, she explained that my name came up as Anastasia Nedd and that I applied as Anastasia Allen, accusing me of doing this to get around the system. I did in fact apply for the Metairie and Marrero positions as Anastasia Allen because it was my legal name after I got married in July 2018. Also, USPS records show the dates of my job terminations as being November 2018 and March 2019, both of which are past my 90-day probationary period. Segura did not notify McFall of her intention to rescind my job offer for the second Metairie CCA position because McFall was on leave; she rescinded the offer before speaking with him about it. (See R. Doc. 59-8, p. 2, ¶ 9, and R. Doc. 59-11, p. 2, ¶ 13.)

6. I interviewed with Chad Taylor for the first Metairie position about a week before I was terminated on February 26, 2019. During the interview, I told him that I had been terminated from Central Carrier Station in July of 2018, filed an EEO, had a redress, and was reinstated. This same information was on my job application and in my candidate profile on the USPS website. I told Taylor that I was currently working at Central as a CCA because I was in fact still employed at the time. I never gave Taylor any other details and did not discuss my getting married. About a week after the interview with Taylor, I was fired for a second time. I called Taylor to see if I had been hired for the position because Porche terminated me. Taylor told me he learned that Porche

6

had said unfavorable things about me to McFall, and therefore, McFall did not hire me. Taylor told me to reapply because he knew what to do to get McFall to "push the button" to get me on in Metairie, then Taylor would take me to Johnson Street. During our second interview, we did not discuss any interview-type questions because at this point I had had several conversations with Taylor and he was confident I would be hired.

7. I met all criteria for the second Metairie position (Job No. 10292967) by passing background screening, drug screening, driving screening, scoring a 99 on the test and being physically able to handle the job. As being a prior employee, I also had some on-the-job experience despite the false and misleading information that my former supervisors provided to McFall and Segura.

## F. STATEMENTS RESPONSIVE TO LAGRUE DECLARATION (R. Doc. 59-16)

1. Supervisor Joe Porche was the official responsible for terminating my employment on February 26, 2019 because I allegedly failed "to perform work which meets the expectations of the position," failed "to accomplish tasks in an efficient and timely manner," and failed "to work at a sufficient speed to keep up with the amount of work required by the position." (R. Doc. 59-7). My work performance in these areas was satisfactory and unworthy of termination. Porche, with the assistance Lagrue and Martin, used these my alleged unsatisfactory work performance as pretextual justifications to terminate my employment because of my age and in retaliation against me for my prior protected EEO complaints (Case Nos. 4G-700-0163-18 and 4G-700-0049-19) against him.

2. My PS Forms 3996, 4584 and 1571 show that I had no deficiencies relating to poor scanning, clock ring errors or delays in delivering mail. The PS form 4584 is an observation form that a supervisor must have when doing a street observation. It will state whether a carrier is delivering the mail in accordance with policy. At the end of the observation, the supervisor must give a copy to management, upload a copy and give a copy to the carrier. I have never received a copy of this form ever. Also, Lagrue never had one when she came out on my route. Regarding the PS Form 1571, a carrier fills it out when returning from the route with mail that is being returned to the station. On occasions when I had to return mail, I submitted PS Forms 1571 stating how much mail was being returned and the reason why. On my PS Forms 3996 I noted many of the inconsistent instructions that were given to me by Supervisor Lagrue.

3. There were several circumstances at the post office and actions by my supervisors that increased the time on my route. First, there are many occasions when the mail arrived at the station late or I was suddenly given additional trays of mail to deliver in addition to the regular daily amount of mail for my assigned routes. Second, my supervisors would hide mail and call me back to the post office claiming that I had left mail behind. Third, they would assign me to different routes making it difficult for me to learn how to deliver mail and to learn a route. Next, my supervisors would not permit me to case (sort) my own mail before going on a route to deliver it, especially when I had a "Hold Down" on a route which according to policy required me to case the route and act like the regular carrier on the route. I was denied this training. My mail was always sorted by carriers who often did not sort it properly. This forced me to double back on my route and go to houses where I had already delivered mail, adding to my time on my route. Despite these issues, I remained focused on doing my job to the best of my ability and learning my craft because I wanted to become a fulltime letter carrier with the USPS. I never socialized with the other employees at

7

my station. Nevertheless, all these things had effect of adding to the time I needed to complete my mail routes, and my supervisors used these incidents to claim I was inefficient and fired me.

4. I never received training from a certified OJT trainer according to policy.

5. Lagrue never trained, coached, counseled or retrained me on how to handle a registered letter/parcel.

6. Lagrue never gave me opportunities to improve and learn my craft during my second probationary period because she failed to evaluate me properly, advise me of deficiencies, and re-train me. She restricted me from doing certain aspects of my job like casing and pulling down my mail which had the effect of hampering my job performance. She also gave me instructions and took actions that prevented me from performing my job effectively.

7. I was never retrained during my second probationary period. I did not attend the mail carrier training academy again. Furthermore, neither Porche, Lagrue or Martin provided me with additional training, coaching, counseling or re-training during this time.

8. My age was a factor in Lagrue's actions in terminating my employment on February 26, 2019. Her age-related bias was evident and ongoing through her preferential treatment of younger CCAs. She also told me to "get [my] old ass back to work."

9. Lagrue knew my age because we once had a conversation about our grandchildren.

10. Lagrue knew about my second EEO complaint (USPS EEO Case No. 4G-700-0049-19) because she mentioned to me that she knew Porche had given me another chance and gave me my job back. She was also charged in that second complaint, so she was informed about the EEO just like Porche. Furthermore, a number of carriers and supervisors were aware of my EEO complaint as I would overhear them discussing it or they would ask me about it.

11. There was no incident on January 2, 2019 where I failed to use a load tool. There is no documentation in my personnel records showing that such an incident ever happened or how Lagrue was able to determine whether I used it or not.

12. On January 10, 2019, I was assigned to deliver mail on Route 2434. There were 3 trays of mail on the rack for Route 2434 and I took all three before I left the station. There were no other trays of mail or parcels present at the station for Route 2434 before I left. During delivery, Lagrue called me to say that I had left a tray of mail at the station. When I returned to the station, I could not find the tray of mail. Lagrue advised that it was in the rack use to store packages without offering explanation of why it was misplaced in a rack of packages. I found the mail covered underneath a bunch of parcels; the mail was not visible until I moved several parcels. It is my understanding of USPS policies and procedures that if a carrier leaves mail behind at the station, their supervisor must document it immediately and give the carrier a copy of the written notice. Lagrue did not write me up for leaving the mail. I then returned to my route to finish delivering my mail. There is no documentation to show that I left mail on January 10, 2019.

13. On January 14, 2019, I had been assigned to help deliver mail on Route 2427, but Porche and Lagrue suddenly switched me to Route 2434, a route I was not familiar with. Another carrier had sorted the mail, secured it with rubber bands and loaded it in the mail truck. While I driving on the route, I hit a pothole causing a tray of mail to fall. The rubber bands popped, scattering mail in the truck. I do not recall whether I was on the phone when Lagrue suddenly arrived without notice. However, I sometimes had to call the station to get help with routes that I was unfamiliar with. It is a common practice of new carriers to call experienced carriers or the station when delivering mail on a route which they do not know. It is my understanding that most supervisors instruct their new carriers to do this.

14. I did not mishandle a registered parcel on January 18, 2018. I could not deliver the parcel because the addressee was not at home to sign for it. Upon returning to the station after completing my route, I followed procedure by filling out a PS Form 3489 and giving the parcel to the station's 204(b) supervisor, Harrison Ward. Once I turned the parcel over to this supervisor, it became his responsibility. Ward did not handle the parcel correctly. It is my understanding of USPS policies and procedures that mishandling registered mail can result in a mail carrier being written up, disciplined in some form, or terminated. My supervisors did not write me up, discipline me or terminate my employment for the mishandling of this registered parcel.

15. On January 30, 2019, Supervisor Lagrue did not give me the arrow key which I needed to access collection boxes, outdoor parcel lockers, cluster boxes units, and apartment panels on my route. This put me in a position of having to bring some mail back to the station because I could not deliver it without the key. I texted Lagrue about my needing the arrow key. It is also reflected in a PS Form 1571 which I filled out concerning the incident. There were other times she did not provide me with an arrow key for routes that required it. I asked for a key whenever the route required one. However, Lagrue would never give me the arrow key. She would say that she forgot, or she would not answer my phone calls to remind her.

16. On February 22, 2019, I was assigned to work two mail routes. When I retrieved my keys for my mail truck, I noticed that the arrow key was missing. I informed Supervisor Lagrue and she said she would find an arrow key for me. She never looked for the key. I told her that I needed to leave for the routes as I had two to cover that day. While on my routes, I called her three times for the arrow key but she did not answer my calls. I had no choice but to return the mail that required delivery with the arrow key. This is another example of Lagrue setting me up to fail during my second probationary period.

17. My supervisors did not treat me fairly or equally with a younger CCA, Chloe Bickman, in these respects:

    a. I was never allowed to arrive at 7am for any routes I put a hold down on.
    b. I was never allowed to sort the mail on my routes.
    c. I was never allowed to work a consistent route.
    d. I was never allowed to be off on Saturdays.
    e. Bickman never got auxiliary mail in addition to the daily mail for her route; I got auxiliary mail on a daily basis.
    f. Bickman was allowed to clock into the office daily, I was not. My supervisors had me clock

9

in with the street time code when I was in the station. This has had the effect of artificially increasing my street time.
  g. Bickman was assigned easier mail routes to cover.
  h. I was given more than three bundles of mail on a walking route.
  i. I was denied an arrow key when needed.
  j. I was not given a voyager card or pin, so I had to purchase gas for the mail truck with my own credit card.

18. My performance during my second probationary period was consistent with USPS policy, procedures and practice.

### G. STATEMENTS RESPONSIVE TO MARTIN DECLARATION (R. Doc. 59-17)

1. As she stated in her declaration, Martin was present to help with my evaluation; she was not called in to witness combativeness from me. However, she did not evaluate me properly or fairly. She did not identify specific areas where I was deficient, provide constructive feedback or offer to train or counsel me so that I could improve. Instead, Martin criticized me about small or non-existent things which had nothing to do with my evaluation or performance.

2. Martin was aware of my second EEO complaint because I named her in it. Based on my understanding of the USPS's handling of EEO complaints, my complaint EEO ADR Specialist, Cabrini Hales then contacted Porche, Lagrue and Martin to see if there could be a resolution via redress if possible.

3. Bianca Martin was not my supervisor because I was not assigned to her zone. She never did street observations with me or any other form of evaluation. Therefore, she has no information or documentation to substantiate any performance issues or to give me feedback or constructive criticism. She does not have firsthand knowledge of my work performance for her to state that it was not meeting expectations. Martin never discussed any of my work performance during my evaluations because she was not my supervisor. Therefore, she did not have firsthand knowledge that I was terminated for an unsatisfactory evaluation.

4. Bianca Martin was not my supervisor because I was not assigned to her zone. Because she was not my supervisor, she never trained me or offered advice or assistance with the performance of my job duties. Therefore, she has no firsthand knowledge of opportunities or training that I received, or that my performance allegedly did not improve.

5. My clock rings were tampered with by my supervisor and other management officials as the clock rings reflect crafts that I did not work in and they do not show any training modes which should have been present for the periods when I was in training. My clock rings show I spent more time on the street delivering mail than I actually did. Furthermore, my clock rings have supervisor ID numbers beside entries that were changed.

6. Lagrue conducted my 30-day evaluation on January 26, 2019, approximately 49 days after the December 8, 2018 start date of my second probationary period. Lagrue backdated my 30-day evaluation to January 7, 2019 as shown on my PS Form 1750 to give the appearance that she

10

conducted my evaluation timely on the 30th day from my December 8, 2018 start date in accordance with USPS policies and procedures. But my clock rings do not show that I was being evaluated on January 7, 2019.

7. Lagrue had recently been assigned to my zone and had not worked with me for a full 30 days.

8. Lagrue conducted my 60-day evaluation on February 16, 2019, which was 21 days after my 30-day evaluation. The 21 days was less than the required 30 days and did not afford me sufficient time to get the proper training and improve my performance. Lagrue backdated my 60-day evaluation to February 6, 2019 as shown on my PS Form 1750 to give the appearance that she conducted my evaluation timely on the 60th day from my December 8, 2018 start date in accordance with USPS policies and procedures. But my clock rings do not show that I was being evaluated on February 6, 2019.

9. Lagrue never trained me as my clock rings do not show I was moved into training mode which Lagrue would have done had she trained me. Furthermore, Lagrue is not a certified OJT trainer. Also, Lagrue did not become a supervisor until January 2019, at which time she joined the Lakeview zone. She was not familiar with any of the routes in that zone nor had she completed her supervisor training. She was not my supervisor long enough to give me a 30-day evaluation and she was not trained to give performance evaluations. Finally, during the month of December 2018, I did not deliver mail. Therefore, there was no information to evaluate me on.

10. Martin was present at both my 30-day and 60-day evaluations. The dates on my PS Form 1750 Employee Evaluation and/or Probationary Report form were clearly written at the top. When Martin initialed the form, she could see the dates written on the form and therefore knew they differed from the dates that my evaluations were actually conducted. They were not conducted on the dates indicated on the PS Form 1750. I have PS Forms 3996 that show the actual dates when I was evaluated because I had asked for additional time to deliver my mail because of the time I spent in the evaluations had caused me to leave late for my routes. My shop steward, Charles Jackson, witnessed the fact that my evaluations were not done timely on the 30-day and 60-day marks.

11. During both evaluations, neither Lagrue nor Martin informed me that I had any deficiencies. They did not tell me that I needed improvement or how to improve at my craft. They did not offer additional training, coaching or counseling. Instead, both supervisors accused me of things on the job which I did not do, or which never happened. Both supervisors aggressively tried to force me to sign the PS Form 1750 until I requested my shop steward which I was within my rights to do.

12. At my request, Supervisor Porche agreed to give me a street evaluation himself or another supervisor with a meeting with me and my shop steward, Charles Jackson. This street evaluation was not performed so neither Porche, Lagrue or Martin had no basis to say there were deficiencies in my ability to deliver the mail. My supervisors never told me that I had performance issues during my second 90-day probationary period.

I declare under penalty of perjury that the foregoing is true and correct.

ANASTASIA NEDD ALLEN

SWORN TO AND SUBSCRIBED before me on this this 1st day of February 2022 in Metairie, Louisiana.

Leonor E. Prieto
NOTARY PUBLIC
Louisiana Bar No. 31530
My Commission expires at death.